IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

UNITED STATES OF AMERICA

v.                                              CRIMINAL ACTION NO. 3:05-00124

MATTHEW JAMES WHITE

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Matthew James White's Motion to Suppress Statements he made on January 23, 2005. [Docket no. 19]. The Court held a hearing on the motion on September 12, 2005. Upon consideration of the arguments and the evidence, and for the following reasons, the Court **DENIES** Defendant's motion.

**I.
FACTS**

On January 23, 2005, law enforcement authorities were looking for Defendant to question him about a murder that occurred in Logan County, West Virginia. Defendant, who was aware that the police were looking for him, called the Logan Detachment of the West Virginia State Police and he was connected to Trooper Anthony Perdue's cell phone. During the recorded conversation, Trooper Perdue informed Defendant that he would like to speak to him about the murder. Defendant told Trooper Perdue that he would be at the Huntington State Police detachment in about fifteen minutes. However, Defendant did not appear within that time period so Trooper Perdue called Defendant on his cell phone. This phone call was not recorded. Defendant testified that during this conversation he told Trooper Perdue that he did not want to speak with the police until he had an opportunity to talk with a lawyer. Trooper Perdue recalled something about

Defendant mentioning an attorney and believed Defendant asked whether or not Trooper Perdue believed Defendant needed an attorney. Trooper Perdue testified that his standard response to such a question is that if a defendant needs an attorney, the defendant is certainly entitled to have one.

Around 6:30 p.m. that day, the police learned that Defendant was in the area of Marshall University in Huntington. Trooper Travis Berry, along with others, went to the location and found Defendant. At first, Defendant ran away, but he soon was apprehended. A radio log showed that Defendant was arrested at 7:06 p.m. When Defendant was arrested, Trooper Berry conducted a search and found a small amount of crack cocaine, plastic bags, and approximately $1,800 in cash. Defendant was then transported to the Huntington State Police detachment by Corporal Blankenship.

At this point the timing of events becomes somewhat blurred. It appears that Defendant was first taken upstairs at the detachment to a "processing area." Defendant states that he was in the processing room for about five minutes and then he was taken downstairs to an interview room. Defendant testified that he was orally told his *Miranda* rights[1] before he was taken down to the interview room. Defendant stated that once he was in the interview room, he initially was not informed again of his rights and he told the officers "I guess I'm going to go to jail for the crack I had in my pocket." (Tr. 106). He said the officers replied that they were not interested in the crack, but wanted to know information about the murder. Defendant said that he then wrote out a statement, but when the officers looked at it, they said it is not what they wanted and threw it

---

[1]*See Miranda v. Arizonia*, 384 U.S. 436 (1966).

away. Defendant testified that he then asked to speak to an attorney before he gave any further statements. Defendant stated there was a short break and then the officers again began questioning him about the murder. The documentary evidence shows that Defendant signed a *Miranda* waiver form at approximately 10:30 p.m., and then he gave a lengthy statement regarding the murder, which appears to have concluded just after midnight.[2] Defendant said that afterwards he was taken to be fingerprinted and then was taken to jail.

To the contrary, Troopers Holbert and Berry and First Sergeant Nelson testified that they never heard Defendant ask for an attorney. First Sergeant Nelson and Trooper Holbert also said that, after they began talking about the murder, Defendant told them he would tell them what happened if they retrieved a white plastic bag that he threw while being chased. Trooper Berry testified that, while he was processing the evidence, he received a call from downstairs to retrieve the white bag, and he left about 9:30 p.m. to go back to the scene to retrieve it. When he found the bag, he looked inside and saw what appeared to be crack cocaine. Trooper Berry stated that he called back to the detachment and informed them that he had found the bag and that it appeared to have crack inside it. Trooper Holbert said that when he told Defendant they had located the bag, Defendant smiled at him and said "That was a lot of dope, wasn't it?" (Tr. 11). Trooper Holbert stated that Defendant then gave his written statement.

While Defendant was being processed before being taken to jail, Trooper Berry said that they were just casually talking with Defendant, and not attempting to further the investigation,

---

[2]The last page of the statement has a date and time of January 24, 2005, at 0007 hours.

when Defendant voluntarily mentioned, in an almost bragging manner, the large amount of crack cocaine that was in the bag. Defendant also said that he had cooked the cocaine in his Huntington apartment. Trooper Berry asked Defendant if he had thrown anything else down when he was being chased, and Defendant said he threw some scales, which Trooper Berry then went and recovered.

## II.
## DISCUSSION

In his motion, Defendant argues that the statements he made to the police should be suppressed because the police officers' version of what occurred is not credible and he had asserted his right to counsel. In its Response to Defendant's motion, however, the Government states that the only statements it seeks to introduce in its case-in-chief are the ones he gave before and after the written statement was given. Specifically, the Government seeks to introduce Defendant's alleged statement that he would tell the officers about the murder if they went to a location Defendant described and retrieved the white bag and the statements Defendant made to Trooper Berry while he was being processed.

With respect to the statements made regarding the white bag, the Court finds that those statements, if true, were made before Defendant alleges he made a request for counsel. Defendant testified that he was orally informed of his *Miranda* rights before he was taken to the interview room, yet he said he did not ask for an attorney until after he wrote out an initial statement and the officers threw it out. Defendant testified that Sergeant Nelson told him they would give him a five minute break and if he did not tell them thereafter what had happened, he would be put in jail for murder. Defendant stated that when they returned after the break they resumed questioning him without interruption. Thus, under Defendant's version of events, if the statements about the bag

-4-

were made, they necessarily were made before he asked for counsel because there was only a five minute break between the time he asked for counsel and the remainder of the interrogation. Although it also appears that these statements were made before Defendant actually signed the *Miranda* waiver form, the Supreme Court has rejected a *per se* rule that a defendant must make an explicit statement waiving his *Miranda* rights. *North Carolina v. Butler*, 441 U.S. 369, 375-76 (1979).  Instead, the Supreme Court held that "[t]he question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *Id*. at 373.  Although mere silence on the issue is not enough, a "defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may . . . support a conclusion" of waiver, which in some cases "can be clearly inferred from the actions and words of the person interrogated." *Id*. (footnote omitted).

In this case, assuming Defendant made these statements, the Court finds Defendant made such a waiver.  Before Defendant was even arrested, he stated he had a conversation with Trooper Perdue about contacting an attorney, and then after his arrest, Defendant admits he was orally given his *Miranda* rights before he was interviewed.  After being told of his rights, Defendant proceeded to give the alleged statements regarding the white bag.  At some point thereafter, Defendant signed the *Miranda* wavier form.  Given these actions by Defendant, the Court finds this evidence sufficient to infer that he understood his rights and knowingly and voluntarily waived those

rights in allegedly telling the officers to go and get the white bag. Therefore, the Court denies Defendant's motion to suppress these statements.[3]

With respect to the statements Defendant allegedly made to Trooper Berry while being processed, there is nothing in the record to suggest that those statements were the result of police-initiated custodial interrogation. Indeed, it appears that Defendant voluntarily made those statements during a casual conversation that he was having with the officers. At the time the statements were made, Defendant already had given the police a long and detailed written statement, and Trooper Berry stated that they were merely talking, just to be talking, and he was not attempting to further the investigation while he was processing Defendant. During that conversation, Trooper Berry said that Defendant voluntarily commented, in an almost bragging manner, about how much crack was in the bag. Defendant did not challenge Trooper Berry's recollection of these events during cross-examination or his own testimony. Although Defendant asserts that he had requested counsel earlier in the evening, the Supreme Court has held that statements made when an accused initiates further communication with the police do not violate the Constitution. *Arizona v. Roberson*,

---

[3] Defendant asserts that the officers' statements that he told them to go out and retrieve the white bag does not make sense because there was no reason for him to voluntarily tell the officers that he had thrown a large amount of crack while he was running from them and then agree to give them a statement about the murder if they went and retrieved the drugs. On this front, the Court agrees with Defendant that it did not make sense for him to have made such a statement, but the facts of the case reveal that, after the alleged statement was made, Trooper Berry went back to the scene and located the drugs where Defendant allegedly told the other officers the bag could be found. In addition, Trooper Berry testified that Defendant later told him that if he went back to the scene he would be able to find scales, which Trooper Berry did. Although the Court agrees with Defendant that it did not make sense for him to make such statements, the Court is well aware that defendants do not always do what is in their best interest when being investigated for a crime and, in any event, this issue is one best reserved for impeachment purposes at trial.

486 U.S. 675, 687 (1988) (stating "any 'further communication, exchanges, or conversations with the police' that the suspect himself initiates are perfectly valid" (quoting *Edwards v. Arizona*, 451 U.S. 477, 485 (1981)). Even if the Court assumes for purposes of this issue that Defendant requested counsel, the Court finds that Defendant's alleged statements fall within this exception. Therefore, the Court denies Defendant's request to suppress these statements.

In his motion, Defendant also makes several arguments regarding the credibility of the officers and the fact that his written statement should be suppressed because he requested counsel before it was given. However, as previously mentioned, the Government does not intend to offer his written statement into evidence in this case. Thus, the Court finds it unnecessary to decide whether it believes the testimony of Defendant or the officers with regard to Defendant's alleged request for counsel.

## III.
## CONCLUSION

Accordingly, for the foregoing reasons, the Court **DENIES** Defendant's Motion to Suppress Statements. The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel and the defendant, the U.S. Attorney's Office, the U.S. Probation Office, and the U.S. Marshals' Service.

ENTER:	October 12, 2005

_____
ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE